UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

STEPHANIE M. TURMAN,            )
        Plaintiff,            )
                    )
v.            )    No. 13 CV 50304
                    )    Magistrate Judge Iain D. Johnston
CAROLYN COLVIN, Acting            )
Commissioner of Social Security,            )
        Defendant.            )

## MEMORANDUM OPINION AND ORDER

This is a social security appeal. For the reasons explained below, the case is remanded.

## BACKGROUND

At the time of the hearing before the administrative law judge ("ALJ"), plaintiff, Stephanie Turman was 28 years old and weighed 288 lbs. R. 32. Since her early twenties, she has had many ailments, some of which have been intermittent in their severity. To summarize, since 2004, she has suffered from depression; since 2006, she has had severe back pain; since 2007, she has had severe abdominal problems including nausea, vomiting, and diarrhea. She has been diagnosed with sciatica, scoliosis, degenerative disc disease, polycystic ovary syndrome, diabetes, asthma, irritable bowel syndrome, gastroparesis, obesity, fibromyalgia, and depression. R. 65-67, 93. She has visited numerous doctors and gone to the emergency room multiple times.

In May 2010, she filed a Title II application for disability benefits and a Title XVI application for supplemental security income. R. 91. She claimed her disability began on November 11, 2008. *Id.*

On February 9 2012, the ALJ held a video hearing at which Ms. Turman testified about her medical history and symptoms, her work history, and her daily activities. Her last job was in

November 2008 when she worked for a couple of months as a clerk at a Halloween superstore. R. 36. She then received unemployment compensation for about a year. R. 35. When asked how she spent her day, she testified: "I just deal with trying to manage the pain, watch TV sometimes, or read books." R. 39. She cooks sometimes, when she can stand long enough, and goes shopping with her mother about once a week. R. 40-41. She has back pain every day: "it's a constant pain, so it could be [set off by] anything from as simple as a cough to sitting or standing in the wrong position." R. 43. She can stand for only a couple of minutes at a time. R. 60. When sitting, she has to switch positions every two to three minutes. R. 61. Once or twice a week, she has a "bad day" when she is in tears from the pain and considers going to the hospital. R. 63.

At the hearing, the ALJ called Dr. Sheldon Slodki as an impartial medical expert. R. 64. He stated that several of plaintiff's diagnoses were "related to" and in theory could cause the "very severe, disabling symptomatology" about which plaintiff testified. R. 71, 73. He pointed specifically to her fibromyalgia, deconditioning secondary to the marked obesity, low back pain from degenerative disc disease, scoliosis, and sciatica. R. 71. He also observed that there were "a lot" of medical records and that plaintiff "goes to the doctor a lot." R. 72-73. At the same time, he noted that her morbid obesity would not count by itself to make her disabled; that he did not find "objective evidence in terms of radiologic evidence of severe lumbosacral spine pathology;" and that he did not disagree with an RFC assessment by an agency doctor. R. 67, 72-74. In the end, he told the ALJ that the case turned on plaintiff's credibility about the severity of her pain and that he had to "drop [this issue] in [the ALJ's] lap." R. 73.

On May 25, 2012, the ALJ issued an opinion finding plaintiff was not disabled. R. 91-104. The ALJ found that plaintiff had the residual functional capacity to do sedentary work and

could perform the jobs of food and beverage order clerk, final assembler, and bench hand assembler. R. 104.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court should not reconsider facts or evidence or make independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The ALJ's opinion in this case rests on his larger conclusion that plaintiff testimony, particularly about the severity of her pain, was not credible. An ALJ's credibility determination should be reversed only if it is "patently wrong." *Minnick v. Colvin*, __ F.3d __, 2015WL 75273, * 7 (7th Cir. Jan. 7, 2015). At the same time, the Seventh Circuit has stated that a credibility determination may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning."). As explained below, the Court finds that the ALJ's explanation is not adequate. The ALJ provided six basic reasons for his larger conclusion. These reasons are set forth at R. 101-102.

### 1. Treatment Gaps and "Lack Of Money."

The ALJ's first reason is that plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual" and that she had "significant gaps" in her treatment. R. 101. The ALJ also was not persuaded that lack of money would explain the gaps because he believed plaintiff did not "pursue[] any low-income health care options." *Id.*

This Court cannot assess this rationale because the ALJ did not provide any explanation or supporting details. What treatments was the ALJ expecting plaintiff should have received? What was the time period for the alleged treatment gaps? Which of plaintiff's many ailments was he focusing on? The answers are not obvious because, as Dr. Slodki observed, there are "a lot" of medical records and plaintiff went to the doctor "a lot." R. 73. She was also taking a number of medications. R. 763. The lengthy record does not create the general impression that she was reluctant to seek treatment as the ALJ suggests. Perhaps there are gaps that are relevant, and those gaps would support a finding that plaintiff is not credible and, therefore, not entitled to benefits. However, on remand, the ALJ should provide a more specific explanation.

In conjunction with this inquiry, the ALJ should investigate more thoroughly whether any such gaps are justified by plaintiff's financial situation. The ALJ believed that plaintiff did not seek out low-cost providers, but as plaintiff points out, she visited Crusader Community Health many times, and it is (according to plaintiff) a low-cost provider. She also went to the emergency room multiple times. She told healthcare providers that she could not pay for some medications and treatment. *See* R. 676 ("Plan to [] pick up Cymbalta when [she] has money on Monday. Discussed bridge medication but doesn't have even $4 to pick up whatever might be prescribed on generic programs."); R. 684 ("[h]aving difficulty affording medications"); R. 871 ("I am not able to fully assess [plaintiff's] response to usual treatments for these conditions, but especially

her back pain, because lack of insurance and financial resources on the part of Ms. Turman has prevented referral to usual avenues of treatment, such as physical therapy."). As the Seventh Circuit has noted, an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Craft*, 539 F.3d at 679 ("although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine."). Likewise here, the ALJ failed to adequately explore whether plaintiff's financial situation explained the alleged treatment gaps.

### 2. The Treatments Worked.

The ALJ's second reason, somewhat at odds with the first, is that plaintiff's treatments were "generally successfully" in "controlling" her symptoms. R. 101. The only explanation given is that plaintiff was "doing well on [a] gastroparesis diet." *Id.* The ALJ did not provide a cite to the record to support this conclusion, but the parties agree that there is only one piece of evidence, which is the treatment notes for an October 3, 2011 office visit with Nurse Hysell. R. 661; Dkt. #20 at 5-6. According to these notes, plaintiff said that her diet had been helpful in controlling her recent severe abdominal symptoms.

In relying on this single office visit, the ALJ overlooked significant contrary evidence suggesting that the dietary solution was only temporary. Specifically, a little over two weeks after this visit, plaintiff called her gastroenterologist and reported that "she is having watery diarrhea with severe cramping," that she is "having 10+ watery stools per day," and that she saw blood while wiping. R. 766. On November 1, 2011, she returned to Nurse Hysell and stated that

she had "severe abdominal pain" for several days. R. 763. On February 3, 2012, she went to the emergency room, reporting that she had been vomiting all day and had diarrhea. R. 867. The ALJ should have evaluated this contrary evidence. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) (an ALJ may not use a "sound-bite" approach in which favorable evidence is cited but unfavorable "related evidence" is ignored); *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014) (same).

### 3. No Objective Evidence Supporting Pain Allegations.

The ALJ's third reason is that plaintiff's severe pain was not supported by objective evidence and that the clinical record "does not reflect any particular expected level of pain." Again, the ALJ did not provide any explanation with specific examples. This Court cannot tell what is meant by "expected pain." Dr. Slodki testified that plaintiff's ailments could cause severe pain, although he also questioned whether there would be more objective evidence for the back pain. More analysis is needed, in part, because plaintiff's ailments are varied and diffuse. Some of her diagnosed conditions, such as fibromyalgia, are not easily established with objective evidence. *See, e.g., Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints.").

Also, the ALJ failed to acknowledge that there is, in fact, some objective evidence in the record. For example, regarding plaintiff's back pain, there is a 2011 medical imaging report stating that plaintiff has "[d]egenerative changes in the spine." R. 854 (report signed by Dr. Frank S. Bonelli). A 2005 medical imaging report states that plaintiff has "[p]rogressing and fairly prominent degenerative changes at the L5-S1 level." R. 500 (report signed by Dr. Mark R. Traill). It is not clear whether the ALJ was unaware of this evidence or whether he instead

considered it but viewed it as insignificant for some unexplained reason. Moreover, lack of objective evidence is not dispositive by itself. *See Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("an ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results").

### 4. Plaintiff Applied for Unemployment Compensation.

The ALJ's fourth reason is that plaintiff applied for unemployment benefits after the alleged onset date. Recently, the Seventh Circuit summarized the law on this issue:

> The case law of this circuit clearly permits the ALJ to give some consideration to [the receipt of unemployment compensation] on the part of the applicant when assessing his credibility. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). But attributing a lack of credibility to such action is a step that must be taken with significant care and circumspection. All of the surrounding facts must be carefully considered.

*Scrogham*, 765 F.3d at 699. Here, the ALJ gave no indication that he had looked at all the "surrounding facts." As plaintiff points out, the ALJ did not consider several issues, including that plaintiff may have been seeking only part-time work and that she was desperate for money to pay for medical care. Dkt. # 21 at 6. On remand, this issue should be considered more fully. During that process, the ALJ may learn, and decide, that these proffered reasons are not true.

### 5. Texting During Interview.

The ALJ's fifth reason is that plaintiff "appeared to be texting" during an interview with a social security employee when she applied for benefits. The evidence is a 3-page questionnaire filled out by an employee named Bolen. *See* Ex. 1E. It is not improper for an ALJ to consider the observations by SSA employees. *See* SSR 96-7p. The problem here is that the observations the ALJ relied on are ambiguous, trivial, and not logically connected to the larger issues in the case.

In his opinion, the ALJ stated as follows about this issue:

> The Disability Report and Reconsideration Report request information from Social Security Administration employees about any difficulties they observe that are exhibited

> by the claimant when completing or filing those forms. No such difficulties were reported in this case (Exhibit 1E). Also, the [SSA] employee noted that claimant was not very helpful when answering the SSA employee's questions and appeared to be texting during the interview. While this does not disprove the claimant's alleged symptoms, it is one relevant factor in reaching a conclusion about the overall credibility of the claimant's allegations.

R. 101. However, Exhibit 1E is more equivocal than this description suggests. First, although the ALJ stated that plaintiff had no difficulties completing the forms, the employee, in fact, stated that plaintiff had difficulties in two of the fourteen areas asked about on the form: hearing and answering. R. 210. The ALJ was thus factually incorrect to state that there were no difficulties. Second, the ALJ's statement that plaintiff was "not very helpful" and "appeared to be texting during the interview" suggests that plaintiff was willfully ignoring the SSA employee throughout the entire interview. But here is what the employee wrote on the questionnaire about plaintiff:

> Tried to help find one source with her telephone[;] however I think she was texting. Had very little idea of times she was seen by medical sources.
>
> Neatly dressed and tried to help but wasn't much help.

R. 210. This description ("I think" she was texting while looking up a source on her phone) raises doubt about whether she was actually texting. But even if she was, the employee noted twice that plaintiff was *trying* to helpful and cooperative. Also, the ALJ never explained how the texting sheds light on either an alleged impairment or plaintiff's credibility.

    **6.    Activities of Daily Living.**

The ALJ's sixth reason is that plaintiff's daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 102. The ALJ relied heavily on a 2010 Function Report plaintiff completed. R. 231-38. In his opinion, the ALJ summarized various activities plaintiff reported doing, such as reading, going for walks, going to the library, swimming, playing videogames, and taking care of her cats. R. 102. The

ALJ also listed a few more activities that plaintiff mentioned during the hearing, including watching TV and going grocery shopping with her mother once a week. *Id.*

In listing these activities, the ALJ did not acknowledge the various qualifications and limitations plaintiff included on both the 2010 Report and in her testimony. For example, she stated on the form: her sciatica "makes it hard to walk, stand for long periods of time, bend over or even stand from a sitting position due to pain" (R. 231); it "sometimes hurts to bend over to put underwear [and] pants on" (R. 232); she "can't bend over to scrub or shave legs" (R. 232); she "can't sit still long enough to do a lot of reading/writing/art" (R. 235); and her mother and sister helped her with activities such as taking care of the cats (R. 232-33). Similar qualifications were described at the hearing, as summarized above. By failing to discuss this contrary evidence, the ALJ did not include a full picture of plaintiff's daily activities. *See, e.g., Scrogham*, 765 F.3d at 699 (reversing and remanding: "the ALJ considered evidence about [claimant's daily] activities selectively, ignoring evidence that contradicted her findings").

In addition to the above problems regarding the ALJ's six reasons, the Court finds that the ALJ also failed to consider plaintiff's obesity. She relies on SSR 02-1p, which requires the ALJ to consider obesity in combination with other impairments. It is undisputed that plaintiff, who weighed 288 pounds at the hearing and had a body mass index ("BMI") over 40, fell into the category of "extreme" obesity. SSR 02-1p. The ALJ excluded obesity from the analysis, stating: "Morbid obesity alone would not provide a basis for current disability. Per the medical expert, the effects of morbid obesity can be minimized with exercise and conditioning." R. 100. However, the ALJ failed to consider whether obesity, while not by itself a basis for disability,

could add to the pain and limitations from the other conditions such as back pain.[1] *See Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014) ("The administrative law judge acknowledged that the plaintiff's obesity was a factor in her leg pain, but did not discuss its bearing on her ability to do sedentary work. Remember that she's almost morbidly obese. This might make it difficult for her to sit for long periods of time, as sedentary work normally requires."); *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) (ALJ gave "meager attention to plaintiff's obesity"). On remand, the ALJ should fully analyze this issue, and determine whether plaintiff's obesity in combination with other impairments supports a finding of disability.

Having found sufficient reasons to justify a remand, this Court will not address plaintiff's remaining arguments because they are less compelling and because the ALJ will be able to consider the entire record on remand. In sum, the court finds that the ALJ's reasons lack sufficient explanation or fail to acknowledge contrary evidence. The Court recognizes that the ALJ's task was not easy, as the medical record is lengthy and plaintiff has a number of diffuse ailments for which doctors have not found a single, neat diagnosis. The Court, therefore, does not suggest that the ALJ must reach any particular result on remand.

---

[1] The government argues that although the ALJ failed to explicitly analyze plaintiff's obesity, he did so implicitly by referring to an RFC report by Dr. Ernst Bone who analyzed the effect of plaintiff's obesity. Dkt. # 20 at p.5; Ex. 9F. This report, however, is bare-bones, stating only that plaintiff could perform a few daily activities, the primary one (based on the fact that it was mentioned twice) being that plaintiff could change the kitty litter. R. 503, 506.

## **CONCLUSION**

For the reasons given, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded for further proceedings consistent with this opinion.

Date: January 20, 2015　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge